656 F.2d 428
 1981-2 Trade Cases 64,288
 UNITED STATES of America, Plaintiff-Cross-Appellee,
v.
CROCKER NATIONAL CORP., et al., Defendant-Cross-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
CROCKER NATIONAL CORP., et al., Defendant-Appellees.
UNITED STATES of America, Plaintiff-Cross-Appellee,
v.
BANKAMERICA CORPORATION, et al., Defendants-Cross-Appellants.
UNITED STATES of America, Plaintiff-Appellant,
v.
BANKAMERICA CORPORATION, et al., Defendants-Appellees.
 Nos. 76-3614, 76-3615, 76-3692 and 76-3738.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Nov. 8, 1978.
Decided Sept. 14, 1981.
Rehearing and Rehearing En Banc Denied Nov. 10, 1981.
 
 Robert Raven, Morrison & Foerster, San Francisco, Cal., for Crocker bank.
 J. Randolph Wilson, Covington & Burling, Washington, D. C., for Equitable Life Assurance Soc., etc.
 Catherine G. O'Sullivan, Dept. of Justice, Washington, D. C., for USA.
 William Simon, Howrey & Simon, Washington, D. C., for Prudential Ins.
 Appeal from the United States District Court for the Northern District of California.
 Before BROWNING, Chief Judge, KENNEDY, Circuit Judge, and CHRISTENSEN,* District Judge.
 BROWNING, Chief Judge:
 
 
 1
 Three questions involving application of Section 8 of the Clayton Act, 15 U.S.C. § 19, are raised on this appeal. The principal issue is whether Section 8 prohibits the same person from serving at the same time as a director of a bank and as a director of an insurance company with which the bank competes, when the competition is such that an agreement between the companies would violate the antitrust laws. A closely related issue is whether the statute prohibits interlocking directorates between a bank holding company and an insurance company, when the only competition is between the holding company's bank subsidiary and the insurance company. Finally, we are asked to decide whether, if otherwise within the reach of Section 8, such interlocking directorates are nonetheless excluded from coverage by the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015.
 
 
 2
 The district court held Section 8 does not apply to interlocking directorates between a bank and a non-bank or between a bank holding company and non-banks. However, assuming coverage, the court held that the McCarran-Ferguson Act would not exempt bank/insurance company interlocks from the antitrust laws.
 
 
 3
 We agree with the district court that the McCarran-Ferguson Act is inapplicable, but hold that Section 8 of the Clayton Act prohibits the bank and bank holding interlocks involved here.
 
 
 4
 Section 8 contains five unnumbered paragraphs. The first three relate to interlocking personnel of member banks of the Federal Reserve System. No director, officer or employee of such a bank may serve as a director, officer, or employee of another, subject to six exceptions. The bar applies whether or not the banks compete, although banks not in adjacent cities or engaged in the same class of business are excluded. Power to enforce the prohibitions of these banking paragraphs is vested in the Board of Governors of the Federal Reserve System.
 
 
 5
 The fourth paragraph contains the provision invoked here. This "competing corporations" paragraph prohibits any person from serving as a director of any two or more corporations "other than banks, banking associations, trust companies, and common carrier" provided any one of the corporations has capital exceeding $1,000,000 and is engaged in commerce, and the corporations are or have been in such competition that an agreement between them would violate the antitrust laws.[1]
 
 
 6
 This proceeding was initiated by the filing of two complaints by the United States challenging interlocking directorates held by five individuals linking three of the nation's largest banks with four of its largest insurance companies.[2]
 
 
 7
 The parties stipulated that each of the appellee banks "by virtue of its business and location of operations, has been and is now a competitor" of the life insurance company or companies with which it is interlocked "in the extension of mortgage and real estate loans(,) and that such competition is not insubstantial." The companies waived any defense that the elimination of this competition by agreement among them would not violate the antitrust laws. The substantial nature of the competition potentially affected is indicated by stipulations that at the beginning of 1975, outstanding real estate loans of the three banks totaled $6.5 billion and those of the four insurance companies totaled $32 billion.
 
 
 8
 As the district court noted, interlocking directorates of this kind are common approximately 40% of the insurance company directors in the United States are also bank directors. United States v. Crocker National Corp., 422 F.Supp. 686, 691 (N.D.Cal.1976).
 
 
 9
 Both sides moved for summary judgment. The district court granted judgment for appellees on the ground that interlocking directorates between banking and non-banking corporations were not covered by the fourth paragraph of Section 8.
 
 
 10
 We conclude that the language of the statute does not exempt interlocking directorates between competing banks and non-banks where the competition between them is such that an agreement would violate the antitrust laws, that there is no indication that Congress intended to exempt such interlocking directorates, and that to exempt them would be contrary to Congress's purpose in enacting the Clayton Act as a whole and Section 8 in particular.[3]
 
 I.
 
 11
 Appellees' primary argument, and the principal ground of decision below, is that the language of Section 8 clearly and unambiguously exempts from the bar of the statute all interlocking directorates between banks and non-banks regardless of the competition between them.
 
 
 12
 Appellees interpret the language of the exclusionary clause ("in any two or more corporations ... other than banks, banking associations, trust companies, and common carriers") to mean "two or more corporations ... (none of which is) a bank, banking association, trust company or common carrier." On its face, however, the language may be read with equal plausibility as meaning "two or more corporations ... (not all of which are) banks, banking associations, trust companies and common carriers."
 
 
 13
 The meaning remains equivocal if the context of the clause is considered. Parsing the paragraph, the district court identified four limiting clauses and concluded that a parallel construction of three of them would support the inference that the "other than" clause applies to both interlocked corporations.[4] This construction would exclude interlocking directorates between competing banks and non-banks from Section 8 entirely. As others have observed,[5] however, when the section is read as a whole the exemption of "banks, banking associations, trust companies" in the competing corporations paragraph appears to relate back to the immediately preceding paragraphs regulating interlocking personnel between a bank and "any other bank, banking association, savings bank, or trust company." Since the banking paragraphs apply only to interlocking personnel between two or more banks, a normal reading would attribute the same meaning to the phrase in the competing corporations paragraph. This construction would exclude from the competing corporations paragraph only interlocking directorates between banks governed by the banking paragraphs. Section 8 as a whole would then cover all horizontal interlocks.
 
 
 14
 As will be seen, the latter interpretation is supported by the circumstances in which the "other than banks" clause was added to the statute.[6] At this point, however, it is sufficient to conclude that the exclusionary clause in the competing corporations paragraph of Section 8 is not so clear and unequivocal, either alone or in context, as to make resort to the legislative history unnecessary.
 
 
 15
 Before turning to the history of Section 8, reference should be made to Section 10, dealing with common carriers. Section 10 replaced a provision originally found in Section 8. Section 10 regulates transactions between a common carrier and another business entity relating to supplies, construction, and maintenance or to the distribution of the carrier's securities. It does not bar personnel interlocks between the carrier and the other party to the transaction, but provides that if such interlocks exist the transaction must be based upon the competitive bid most favorable to the carrier.[7]
 
 II.
 
 16
 The applicability of the competing corporations paragraph of Section 8 to interlocking directorates between competing banks and non-banks was not clearly addressed by Congress. Possible references to the subject, discovered by the parties in an exhaustive examination of the legislative materials, are in themselves ambiguous.[8] The scope of the statute must be determined from less direct evidence; "(s)tatutory language should be construed in accordance with its underlying purpose." TRW, Inc. v. F.T.C., 647 F.2d 942, at 946 (9th Cir. 1981). Therefore, we must "look to the 'object and policy of the law.' " Stafford v. Briggs, 444 U.S. 527, 536, 100 S.Ct. 774, 780, 63 L.Ed.2d 1 (1980) (citation omitted).
 
 
 17
 After two decades of experience under the Sherman Act it was widely felt among persons interested in such matters that the Act had failed to accomplish its objectives.[9] The Clayton Act was proposed to supplement the Sherman Act and remedy its perceived deficiencies.[10] The Act condemned certain practices not clearly barred by the Sherman Act that were believed to threaten free competition and lead to monopoly.[11]
 
 
 18
 Interlocking directorates were of particular concern. The Democratic platform of 1908 called for abolition of interlocking directorates between competing corporations; the 1912 platform urged prohibition of all interlocking directorates.[12] Woodrow Wilson emphasized the issue in his successful campaign for the Presidency.[13] Shortly before Mr. Wilson's inauguration, a congressional report recommended that "interlocking directorates in potentially competing financial institutions be abolished and prohibited."[14] In his Inaugural Address President Wilson asserted that "all agreed that 'private monopoly is indefensible and intolerable,' " and called
 
 
 19
 for laws which will effectually prohibit and prevent such interlockings of the personnel of the directorates of great corporations banks and railroads, industrial, commercial, and public-service bodies as in effect result in making those who borrow and those who lend practically one and the same, those who sell and those who buy but the same persons trading with one another under different names and in different combinations, and those who affect to compete in fact partners and masters of some whole field of business.[15]
 
 
 20
 Representative Clayton, Chairman of the Committee on the Judiciary, embodied the President's requests in proposed legislation dealing with interlocking directorates in three overlapping categories. The first dealt with carrier and public service corporations, their suppliers, and banks. The second dealt with banks, prohibiting service as a director of two or more federal reserve banks. The third dealt with competing corporations. Common directors were "conclusive evidence" that there was no competition between the corporations having common directors, and if such corporations were or have been "natural competitors," a violation of the Sherman Act was "conclusively presumed."[16] No class of corporation was excluded.
 
 
 21
 After extensive hearings before the Judiciary Committee, Rep. Clayton introduced a revised bill, H.R.15657. Section 8 contained the provisions regarding interlocking directorates. As the bill emerged from the Committee, the prohibition against interlocks between carriers and their suppliers and banks remained essentially as in the tentative bill. The prohibition against interlocks between banks was also essentially unchanged, but was made applicable only when one of the interlocked banks had deposits, capital, surplus, or undisclosed profits of more than $2,500,000 or when both banks were located in the same city. The prohibition against competitor interlocks took its present form (including the limitation of corporations having capital, surplus, or undisclosed profits of $1,000,000) except that the exclusionary clause was confined to "other than common carriers."[17]
 
 
 22
 In reporting the bill the House Judiciary Committee quoted President Wilson's condemnation of interlocking directorates and stated that the Committee had "endeavored to carry out the recommendation of the President."[18] The Committee's Report spelled out the purposes behind the bill's three substantive prohibitions. The provisions of the first were designed to "prevent absolutely common directors or interlocking directors between corporations occupying relations to each other described therein,"[19] that is, vertical relations between a carrier and its suppliers, and between a carrier and banks dealing in its securities. The purpose of the second prohibition, barring interlocking personnel between banks with more than $2,500,000 capital, "is to prevent as far as possible control of great aggregations of money and capital ... to prevent the concentration of money or its distribution through a system of interlocking directorates."[20]
 
 
 23
 The purpose of the paragraph barring interlocking directorates between competing corporations was strongly stated:
 
 
 24
 The concentration of wealth, money, and property in the United States under the control and in the hands of a few individuals or great corporations has grown to such an enormous extent that unless checked it will ultimately threaten the perpetuity of our institutions.... The truth is that the only real service the same director in a great number of corporations renders is in maintaining uniform policies throughout the entire system for which he acts, which usually results to the advantage of the greater corporations and to the disadvantage of the smaller corporations which he dominates by reason of his prestige as a director and to the detriment of the public generally.[21]
 
 
 25
 The emphasis upon the importance of the prohibition against the sharing of common directors by large competing corporations is understandable. The central purpose of the Clayton Act was to supplement the Sherman Act.[22] The central purpose of the Sherman Act was "preserving free and unfettered competition as the rule of trade." Northern Pacific Railway Co. v. United States, 356 U.S. 1, 4, 78 S.Ct. 514, 517, 2 L.Ed.2d 545 (1958). As the Judiciary Committee pointed out, common directors perform the function of "maintaining uniform policies" among the corporations they serve. The initial formulation of the bar against interlocking directorates between competing corporations rested on the premise that elimination of the competition between the corporations was to be presumed from the very existence of common directors. This remained the essence of the prohibition. Interlocking arrangements between competing corporations threaten the basic purpose of the Sherman Act and are therefore treated as illegal per se.[23]
 
 
 26
 Even the minority of the Judiciary Committee recognized that the prohibition of interlocking directorates between competing corporations "comes measurably closer to the principle of the Sherman Act than any of the preceding provisions relating to interlocking directorates."[24] Recent analysis supports the assumption upon which this provision of the Clayton Act rests: a direct interlock between competitors "seems intended solely to suppress competition. No legitimate reason for the sharing of directors by competitors appears."[25]
 
 
 27
 There was little debate in the House on the provisions relating to interlocking directorates. The need for regulation was widely accepted and the proposed prohibitions relatively non-controversial. What comments there were referred mainly in broad terms to the evils arising from such arrangements "so well known as to be commonly understood"[26] and the desirability of abolishing them.[27] The accepted principle was that "(t)here can be no real competition between companies engaged in commerce where the same persons control the policies of the different companies."[28]
 
 
 28
 Substantial changes were made in the Senate. None of them, however, were attributable to any difference in view with the House as to the evil of interlocking directorates among large competing corporations and the purpose of Congress to bar them. What the Senate said and did reflected its concurrence in the view of the House on these issues.
 
 
 29
 The Report of the Senate Committee on the Judiciary stated that the theory and scope of the bill as it passed the House was unchanged that its purpose was to supplement the Sherman Antitrust Act and, by prohibiting certain trade practices, "to arrest the creation of trusts, conspiracies, and monopolies in their incipency and before consummation." Among the trade practices "denounced and made unlawful" were "interlocking directorates."[29] The Senate Committee adopted verbatim the analysis of the House Judiciary Committee in recommending passage.
 
 
 30
 The Senate Committee did propose significant changes in the treatment of vertical interlocks among carriers, their suppliers, and the banks that handled their security issues; and in the treatment of horizontal interlocks between banks. With respect to the former, the Committee stated, "especially in the case of railroads, emergencies may arise when absolutely prohibitory law against such dealings would be most injurious to the public".[30] The Committee recommended substitution of a provision allowing interlocks but requiring competitive bidding under the supervision of the Interstate Commerce Commission. The Committee also recommended that the paragraph in the House bill relating to interlocks between banks be stricken, and that "such additional regulation of bank directorates as may be wise and just should be made by amendments to the national bank acts, and the enforcement of it given to the Comptroller of the Currency and the Federal Reserve Board."[31]
 
 
 31
 The Committee report recommended no tempering of the bar against interlocks between large competing corporations. Such interlocks were strongly condemned during floor debate. Speaking for the Committee, Senator Shields stated that "(t)he object of this whole section, Mr. President, is to prevent the common and well-known evil of interlocking directorates, and thus a practical combination of different corporations engaged in commerce, which inevitably results in restraint of trade and monopoly."[32] Arguing that the prohibition was too weak, Senator Cummins described the interlocking directorates between competing corporations as a practice "we all recognize as a vicious one, as one which insidiously destroys the reasonable rivalry and independence that ought to exist ..."[33]
 
 
 32
 The provisions relating to interlocking directorates recommended by the Committee were adopted by the Senate.
 
 
 33
 To resolve differences between House and Senate, a Conference Committee agreed upon three changes in the Senate provisions. The bar against interlocking directorates between banks was restored, but the minimum population of cities in which bank interlocks were barred without regard to size was raised from 100,000 to 200,000, and the minimum capital required before the prohibition applied elsewhere was raised from $2,500,000 to $5,000,000. The exclusionary clause in the provision barring interlocks between competing corporations was changed from "other than common carriers" to "other than banks, banking associations, trust companies and common carriers." Finally, the provision requiring competitive bidding in transactions between common carriers and their suppliers was removed from Section 8 and placed in a separate section.
 
 
 34
 The report of the Conference Committee gave no reason for the changes. However, nothing in the debate leading to the adoption of the Committee report suggests any retreat by Congress from the view that interlocking directorates between large competing corporations were contrary to the public interest and should be condemned.
 
 
 35
 In sum, the legislative materials establish that the Clayton Act was intended to supplement and strengthen the Sherman Act in preserving a free competitive economy; that interlocking directorates between large competing corporations were regarded as a precursor to restraint and monopoly and thus as a most serious threat to free competition; and that such interlocking directorates were strongly condemned. As Judge Weinfeld has said:(T)he broad purposes of Congress are unmistakably clear. Section 8 was ... intended to strengthen the Sherman Act, which, through the years, had not proved entirely effective.... Interlocking directorships on rival corporations had been the instrumentality of defeating the purpose of the antitrust laws. They had tended to suppress competition or to foster joint action against third party competitors. The continued potential threat to the competitive system resulting from these conflicting directorships was the evil aimed at. Viewed against this background, a fair reading of the legislative debates leaves little room for doubt that, in its efforts to strengthen the antitrust laws, what Congress intended by § 8 was to nip in the bud incipient violations of the antitrust laws by removing the opportunity or temptation to such violations through interlocking directorates....[34]
 
 
 36
 The Federal Trade Commission has arrived at the same conclusion:
 
 
 37
 Section 8 of the Clayton Act, 15 U.S.C. 19, clearly enunciates a strong Congressional policy disfavoring interlocking directorates....
 
 
 38
 Congress enacted the Clayton Act ... in response to the perceived shortcomings of the Sherman Act, as interpreted by the courts, in abating what were seen as unhealthy concentrations of economic and political power. One of the practices which was singled out for particular concern was the interlocking directorate....
 
 
 39
 That Congress, in enacting Section 8, intended to outlaw interlocks between substantial competitors is unmistakable....[35]
 
 
 40
 Interpreting the ban of the competing corporations paragraph of Section 8 to apply to interlocking directorates between large competing banks and insurance companies would thus further the unmistakable general purpose of Congress.
 
 III.
 
 41
 This interpretation is also favored by the "governing statutory presumptions." Federal Maritime Commission v. Seatrain Lines, Inc., 411 U.S. 726, 732, 93 S.Ct. 1773, 1778, 36 L.Ed.2d 620 (1973).
 
 
 42
 Section 8 is a remedial provision. It must be liberally construed to accomplish its prophylactic purpose.[36] The interpretive standard the Supreme Court applied to the Robinson-Patman amendments in FTC v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968), is equally applicable here: conceding the language of the statute to be unclear, "we cannot, in the absence of an unmistakable directive, construe the Act in a manner which runs counter to the broad goals which Congress intended it to effectuate." Removing bank/non-bank interlocks from the scope of the competing corporations paragraph would run counter to Congress' broad goal of maintaining a free competitive economy by barring interlocking directorates between large competing corporations. Such a result would also run counter to Congress' purpose of inhibiting the concentration of control over money and capital by enacting the banking paragraphs prohibiting interlocking directorates between financial institutions.[37] Interlocking directorates between banks and interlocking directorates between competing non-banks would be barred, but interlocking directorates between competing banks and non-banks would not be, even though they would offend the Congressional purpose underlying not only one of the prohibitions, but the purpose underlying both.
 
 
 43
 Such an interpretation would also be inconsistent with the settled canon of construction that " '(i)mmunity from the antitrust laws is not lightly implied,' " a principle "which reflects the felt indispensable role of antitrust policy in the maintenance of a free economy." United States v. Philadelphia National Bank, 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963) (citations omitted). We must apply the doctrine that "the antitrust laws ... are to be construed liberally and ... the exceptions from their applications are to be construed strictly." Abbott Laboratories v. Portland Retail Druggists Ass'n., Inc., 425 U.S. 1, 11, 96 S.Ct. 1305, 1313, 47 L.Ed.2d 537 (1976). "This doctrine is not limited to implicit exemptions from the antitrust laws, but applies with equal force to express statutory exemptions." Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. 205, 231, 99 S.Ct. 1067, 1083, 59 L.Ed.2d 261 (1979). A liberal construction of the competing corporations paragraph includes interlocking directorates between competing banks and non-banking corporations within its bar; a strict construction of the exception confines the "other than banks" exclusionary language to directorates between banks.
 
 
 44
 To avoid this conclusion appellees argue that the exclusionary clause is not an exception to a general antitrust prohibition embodied in the competing corporations paragraph. Instead, they contend, Sections 8 and 10 together reflect a "highly selective" regulatory scheme to prohibit some interlocking directorates and permit others. As has been seen, however, the language of the competing corporations paragraph, the climate of opinion out of which it grew, and the legislative history of the provisions, all reflect a purpose, based upon specific and clearly articulated policy considerations, to condemn interlocking directorates among large competing corporations generally subject only to the specific exemptions stated in the statute.[38] As the Federal Trade Commission has said, "(N)owhere ... is there any indication that Congress carefully considered interlocks between banks and competing non-banks, and made a conscious decision to immunize such arrangements while generally condemning other horizontal interlocks."[39] There is no statement in the legislative history of a specific intention to exclude such interlocks; there is no expression of any purpose such an exclusion might have served. It is therefore appropriate to regard Section 8's prohibition against interlocking directorates between large competing corporations as a legislative embodiment of the fundamental national policy favoring a free competitive economy, and the "other than banks ... and common carriers" clause as an express exception to that policy, which, narrowly construed, does not immunize the interlocks in this case from the general bar.[40]
 
 
 45
 As noted at the outset, this construction is supported by the statute's language and structure.[41] A normal reading of Section 8 leads to the conclusion that the exclusionary clause was intended to coordinate the provisions of Section 8 relating to horizontal interlocking directorates by removing interlocks between banks from the competing corporations paragraph because such interlocks were regulated by the preceding paragraphs. The legislative history, supports this conclusion as to the function of the exclusionary clause.
 
 
 46
 As we have noted, the Senate struck the provision relating to bank interlocks. It was restored by the Conference Committee which at the same time added banks to the exclusionary clause in the competing corporations paragraph.[42] The district court concluded that these changes reflected a compromise agreement to restore the bar to interlocks between banks in return for the complete exemption of banks from the bar against interlocks between competing corporations.[43] There is nothing other than an inference from the changes themselves to support the court's theory, and the result, as we have seen, is contrary to Congress' objectives.
 
 
 47
 There is an alternative explanation that is fully consistent both with the changes made and with Congress' basic purpose. It will be remembered that in addition to the changes mentioned, the Conference Committee made two changes in the bank provisions designed to limit the applicability of the bar against bank interlocks: the minimum capital was raised from $2,500,000 to $5,000,000; the size of cities in which interlocks were barred without respect to the size of the banks was raised from 100,000 to 200,000. The obvious inference is that it was this restriction of the applicability of the bar against inter-bank interlocks, and not the total exclusion of banks from the competing corporations paragraph, that induced the Senate to agree to a restoration of that bar against inter-bank interlocks.
 
 
 48
 There was also a clear reason other than total exemption for adding banks to the exclusionary clause. A proposal to raise the threshold for applicability of the competing corporations provision from a minimum capital of $1,000,000 to a minimum of $5,000,000 was not adopted.[44] Thus the competing corporations paragraph was applicable to corporations of much less substantial size ($1,000,000) than the restored bank interlock prohibitions ($5,000,000), and contained no population requirement at all. Moreover, the restored provision barring inter-bank interlocks contained a series of exceptions not applicable to the bar against interlocks between competing corporations. Thus interlocks between competing banks that were not barred by the banking paragraphs might nonetheless have been barred by the competing corporations paragraph unless specifically excluded from the latter. As the House Conferees informed the House, the addition of banks to the exclusionary clause accomplished this purpose and thus protected the compromise agreement between the House and the Senate.[45]
 
 
 49
 Under this construction of the reference to banks in the exclusionary clause, banks are exempt from the competing corporations paragraph's bar against interlocks between large competing corporations only to the extent necessary to permit the provision regarding interlocks between banks in the banking paragraphs to be fully effective. To go farther, and wholly exclude banks from the general prohibition of the competing corporations paragraph, would be both unnecessary and contrary to Congress' general purpose.
 
 
 50
 Appellees resist this interpretation on the ground that the reference in the exclusionary clause to banks must be given the same effect as the reference to common carriers, and that the effect of the reference to common carriers is to exclude carriers from the competing corporations paragraph entirely. But the references in the exclusionary clause to banks and common carriers do not have a common origin. There is no basis for the assumption that they are to be read in the same way. They entered the exclusionary clause at different times and involve different considerations; there is no reason they should not have different effects. The reference to banks was inserted in the exclusionary clause late in the legislative process. The circumstances suggest a purpose to avoid inconsistent regulation of interlocks between banks. This specific purpose is entirely satisfied, and Congress' general purpose to maintain competition and limit the concentration of capital is equally served, by an interpretation that restricts the effect of the bank reference to exclusion from the competing corporations paragraph of inter-bank interlocks only.
 
 
 51
 An exclusionary clause applicable to carriers, on the other hand, was included in H.R. 15657 as this bill was filed. The substantive provisions of the bill relating to carriers had a different purpose and took a different form than the substantive provisions relating to banks and competing corporations. The purpose of Section 10, the carrier provision, was to protect carriers from overreaching and conflicts of interest.[46] The statute does not seek to accomplish this purpose by barring interlocking directorates between carriers and corporations engaged in furnishing them with supplies or in distributing their securities, but by requiring competitive bidding when such interlocks exist.
 
 
 52
 Appellees argue that this provision implicitly approves interlocks that might be barred by the competing corporations paragraph, and that to avoid possible inconsistency between Section 10 and the competing corporations paragraph of Section 8, exclusion of carrier interlocks from the competing corporations paragraph must be total. We need not decide that question.
 
 
 53
 It is evident, in any event, that Congress chose to deal with banks and carriers differently, that the reference to the two types of corporations in the exclusionary clause have different purposes and different histories, and that each must be interpreted in light of the different considerations applicable to it. It is alone sufficient to justify different interpretation of the two references that the principal consideration requiring a restrictive reading of the bank exemption does not apply to the exclusion of carriers: Congress did not evidence a general antipathy toward interlocks between carriers and those with whom they did business that would be furthered by confining the common carrier exception within narrow limits. With respect to interlocks with banks, as has been seen, such antipathy was clear.
 
 IV.
 
 54
 Appellees contend that a number of circumstances reflect a Congressional intention to exclude interlocking directorates between competing banks and non-banks from the bar of the statute. None of the circumstances relied upon points directly to that construction; some more strongly support the contrary interpretation; most are simply ambiguous. Cumulatively they fall far short of the "unmistakable directive"[47] required to justify a construction of the competing corporations paragraph in a manner so inconsistent with the broad goals Congress intended to achieve. A brief consideration of these circumstances follows.
 
 
 55
 Appellees argue that the testimony of two notable witnesses before the House Judiciary Committee, Louis Brandeis and Samuel Untermyer, reflect the opinion that interlocking directorates between competing banks and insurance companies are not within the statute. The testimony was directed to the statute's role in eliminating conflicts of interest[48] and to the question of coverage of insurance companies by the banking provisions.[49] It implies no view as to the scope of the competing corporations provision and therefore no view as to interlocks between banks and insurance companies that compete with one another.
 
 
 56
 Appellees argue that the structure of the statute reflects a "tight compartmentalization" of mutually exclusive provisions relating to common carriers, banks, and industrial corporations, and therefore banks and insurance companies would not be covered under the same provision. They rely upon a statement in the House Judiciary Committee's report that "(t)his section is divided into three paragraphs, each of which relates to the particular corporations described, and the provisions of each paragraph are limited in their application to the corporations belonging to the class named therein."[50] They also rely on references in this report and elsewhere identifying the competing corporations provision as a provision relating to "industrial corporations."[51]
 
 
 57
 The bill to which the Committee report referred was not "compartmentalized" in the rigid sense appellees suggest. The "common carrier" paragraph did not apply to common carriers alone. It barred interlocks between a carrier and "any other corporations" selling or leasing supplies to the carrier, and to any "partnership, or bank, or trust company" involved in underwriting, selling, or disposing of issues of the carrier's securities.[52] It thus expressly applied to banks, although the paragraphs barring interlocking directors between banks obviously applied to banks as well.
 
 
 58
 The use by some Congressmen of the term "industrial corporations provision" was simply a short-hand means of identifying the provision relating to competing corporations. It is not a key to the provision's scope. Appellees would not contend that large corporations competing in retail distribution, for example, would not be within the competing corporations paragraph. The term "industrial corporations" does not appear at all in the statute the paragraph in question applies to "any two or more corporations" which are or have been "competitors, so that an elimination of competition by agreement between them would constitute a violation of any of the antitrust laws." No doubt the primary impact of the provision was expected to be upon corporations competing with each other in industrial activity. Examples of interlocks among such corporations were prominent in discussions of the evils sought to be remedied.[53] Banks, on the other hand, were not generally thought of as competing with businesses other than banks. Indeed, some may have believed the competing corporations provision would not apply to banks for jurisdictional reasons it applied only to corporations "engaged in (interstate or foreign) commerce," and it was not settled that banking could be regulated by Congress under the Commerce Clause.[54] Even if such assumptions were generally entertained, however, they would not evidence an affirmative intention that banks should be exempt from the general prohibition of interlocking directorates between large competing corporations even if, in fact, they did compete with non-bank corporations and if, in law, they were considered to be engaged in "commerce."[55]
 
 
 59
 Appellees point to a statement by Representative Cullop during floor debate that the concluding sentence of the competing corporations paragraph "does not relate to banking. That relates to industrial and commercial corporations, or institutions of that kind, but has no reference whatever to the banking business."[56] However, the subject under debate was not the bar against interlocks between competing corporations, but the bar against inter-bank interlocks. Representative Cullop was making the point that the concluding sentence of the paragraph relating to competing corporations did not provide an escape from the provisions relating to inter-bank interlocks. The reference to the scope of the provisions relating to competing corporations is thus both incidental and ambiguous, and affords an unreliable guide to the provision's meaning.
 
 
 60
 Similarly, a statement by Representative Carlin that "we apply an entirely different rule to the industrial corporations" was made in response to a question as to whether the banking provisions' exception for small banks applied as well to industrial corporations.[57] The irrelevance of the banking exceptions to industrial competitors has no bearing on whether the "entirely different rule" of the competing corporations provision applies to banks that qualify under its competition clause.
 
 
 61
 Appellees attach great significance to an exchange on the House floor during the debate on the report of the Conference Committee. This appears to be the only occasion during the legislative proceedings in which the question of whether the exclusionary clause exempts interlocks between competing banks and non-banking corporations from the scope of the competing corporations paragraph was clearly raised. Representative Mann stated that the inclusion of banks in the exclusionary clause had this effect. Representative Mann, however, was an opponent of the result he read into the statute, and the proponents of the statute had no opportunity to respond.[58] In these circumstances the comment has little weight.[59]
 
 V.
 
 62
 Appellees also rely on a number of congressional staff reports published after the enactment of the Clayton Act in support of the view that Section 8 does not reach interlocks between banks and non-banking corporations. These materials are unpersuasive for a variety of reasons. The congressional staff reports are merely assertions without analysis or support, are ambiguous, or refer to vertical interlocks or interlocks between banks and not to interlocks between competing corporations.[60]
 
 
 63
 Appellees argue that subsequent introduction of legislative proposals that would have barred bank/non-bank interlocks[61] indicates that Congress thought Section 8 did not do so, and that the failure of these proposals indicate Congress did not wish to prohibit such interlocks. No relevant inference can be drawn from these proposals. None expressly prohibited interlocks between competing banks and non-banking corporations. Even if they had, an amendment proposed to close an apparent loophole may be defeated because "the existing legislation already incorporated the offered change." United States v. Wise, 370 U.S. 405, 411, 82 S.Ct. 1354, 1358, 8 L.Ed.2d 590 (1962).[62] Moreover, all of the proposals were broadly stated. Since Congress' failure to enact them may have reflected disagreement with any of their comprehensive provisions, it is not evidence that Congress believed interlocks between banks and competing non-banking corporations should not be prohibited. Moreover, even if an inference as to the views of a subsequent Congress could be drawn from these proposals, only the views of the Congress that enacted the Clayton Act are relevant. "(T)he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." United States v. Philadelphia National Bank, 374 U.S. 321, 348-49, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963).[63]
 
 
 64
 The enactment and later repeal of Section 8A of the Clayton Act is also irrelevant. Section 8A was adopted in 1933 as part of a comprehensive scheme to restore public confidence in banking by curbing bank involvement in securities speculation,[64] and was repealed two years later. It barred interlocking relationships between banks and business entities making loans secured by stocks or bonds. It had nothing to do with fostering competition; it applied whether or not the interlocked entities competed. It applied only to interlocks between banks and companies making loans secured by securities, and had no bearing on other interlocks between banks and non-banking corporations. Conversely, the competing corporations provision of Section 8 did not prevent interlocks between banks and corporations making loans secured by stocks or bonds if they did not compete. In view of the dissimilarity in both purpose and effect, enactment and repeal of Section 8A throws no light on whether the Congress that adopted 8A in 1933 or the Congress that repealed it in 1935 thought the competing corporations paragraph of Section 8 was applicable to bank/non-bank interlocks.[65]
 
 VI.
 
 65
 Nothing in the plethora of materials relied upon by appellees or by the government resolves the ambiguity as to whether the competing corporations provision covers interlocking directories between large competing banks and non-banking corporations. The factor that compels resolution of the ambiguity in favor of coverage is the purpose of Congress. We have seen that coverage is consistent with Congress' overall purpose to strengthen the Sherman Act by prohibiting interlocking directorates that threaten competition. Non-coverage is inconsistent with that purpose.[66] Nowhere in the legislative history is there any suggestion that exclusion of interlocking directorates between large competing banks and non-banking corporations would serve any countervailing Congressional policy.
 
 
 66
 The district court accepted appellees' policy argument that banning interlocks between banks and insurance companies "could clearly reduce the number of qualified directors, possibly to the detriment of the public at large." 422 F.Supp. at 702. The primary support for this proposition came not from the legislative history but from a 1971 statement by Arthur Burns, Chairman of the Federal Reserve Board, that because of the "experience and expertise" of bankers, their service on boards of directors of other corporations "may be good for the corporations involved and the public they serve."[67]
 
 
 67
 Five years after the statement quoted by the district court, however, Mr. Burns explained that his statement that interlocking directorates involving bankers "are not necessarily harmful" did not apply to interlocking directorates between corporations competing for funds:
 
 
 68
 (I)nterlocking relationships between institutions that compete for the funds of the public involve a risk of abuse that the Board believes outweighs the reasonable expectation of benefits that might flow from such relationships.[68]
 
 
 69
 Moreover, in testimony before the House Committee on Banking and Currency, Mr. Burns repeated his view that interlocks between competing financial institutions should be prohibited, and advocated an amendment to Section 8 to make it "entirely clear that (the competing corporations paragraph of Section 8) applies to interlocks between banks and non-bank businesses."[69]
 
 
 70
 In any event, Mr. Burns' view, however perceptive, is nonetheless irrelevant. At issue is the policy judgment of the Congress that enacted the Clayton Act. The legislative history leaves no doubt that the Congress viewed interlocking directorates between large competing corporations as contrary to the public interest because they potentially eliminate competition and lead to the concentration of capital,[70] and specifically rejected "(t)he idea that there are only a few men in any of our great corporations and industries who are capable of handling the affairs of the same" as "contrary to the spirit of our institutions."[71]
 
 VII.
 
 71
 The inapplicability of the competing corporations provision to interlocks between competing banks and non-banking corporations is assertedly supported by "(m)ore than 60 years of administrative interpretation ... of Section 8."[72]
 
 
 72
 The evidence of the views of the Federal Trade Commission relied upon by the district court is equivocal[73] and in any event of little force in light of the opinion filed by the Commission in In re Perpetual Federal Savings & Loan Ass'n., 90 F.T.C. 608 (1977), vacated on other grounds, 94 F.T.C. 401 (1979), after the decision below. The Commission held that interlocks between a savings and loan company and competing banks violate the policy of Section 8 of the Clayton Act and are therefore an unfair trade practice violating Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Technically it was unnecessary for the Commission to decide whether such interlocks also violated Section 8, but the Commission's review of the legislative history leaves no doubt of the Commission's view. The Commission rejected essentially all of the arguments advanced by appellees in this case. The Commission found it "unmistakable" "(t)hat Congress, in enacting Section 8, intended to outlaw interlocks between substantial competitors," 90 F.T.C. at 654, and found that "director interlocks between competitors are the evil at which Section 8 of the Clayton Act is directed," id. at 655. The Commission could identify no policy consideration that excludes bank/non-bank interlocks from Congress' "clear antipathy toward interlocking directorates," id. at 656, and concluded that is no "indication that Congress carefully considered interlocks between banks and competing non-banks, and made a conscious decision to immunize such arrangements while generally condemning other horizontal interlocks." Id. (emphasis in original).
 
 
 73
 The Department of Justice's interpretation is said to be reflected in a statement of a former Assistant Attorney General, and in the paucity of enforcement activity. The Assistant Attorney General's statement in fact recognizes the ambiguity of the statute,[74] and the failure of enforcement officials to act is not a binding administrative determination of Congress' intent as to the statute's scope.[75]
 
 
 74
 Because the purpose of strengthening the Sherman Act by eliminating interlocking directorates between large competing corporations is obviously best served by reading the ambiguous language of the exclusionary clause in the competing corporations paragraph of Section 8 as limited to interlocking directorates between banks; and because no purpose reflected in the legislative history of the Clayton Act would be served by excluding from the coverage of the statute interlocks between banks and non-banking corporations that are in such competition with each other that an agreement between them would violate the Sherman Act, we conclude that the statute should be interpreted to bar such interlocks.VIII.
 
 
 75
 Appellees contend that even if the interlocks between the insurance companies and the banks in this case violate Section 8's prohibition against interlocks between competing corporations, the interlocks between the insurance companies and the bank holding companies do not because the insurance companies and the bank holding companies are not "competitors" as required before the competing corporations provision of Section 8 is applicable.
 
 
 76
 The parties stipulated that each bank is the wholly-owned subsidiary of its parent company and that each parent company is a bank holding company registered under the Bank Holding Company Act, 12 U.S.C. § 1841 et seq. It is also stipulated that the bank holding companies are not in and of themselves or through any subsidiaries, other than their bank subsidiaries, competitors of any of the insurance companies, but that each bank holding company controls its subsidiary bank by and through its ownership of stock and its election of all the subsidiary's directors who in turn manage the bank and select the officers that control the bank's operations and activities.[76]
 
 
 77
 A parent corporation is not a competitor of another corporation merely because its subsidiary is.[77] On the other hand, to interpret Section 8 as meaning that the business activity of the subsidiary can never be considered in determining whether the parent is a "competitor" within the meaning of Section 8 would assume that Congress intended to permit such a simple and obvious means of avoidance as to render the statute meaningless, and would ignore the Supreme Court's admonition that the antitrust laws are "aimed at substance rather than form." United States v. Yellow Cab Co., 332 U.S. 218, 227, 67 S.Ct. 1560, 1565, 91 L.Ed. 2010 (1947).
 
 
 78
 Whether for the purposes of Section 8 the business of a subsidiary is to be attributed to a parent in determining if the parent competes with another corporation with which it is interlocked, turns upon the extent of the control exercised by the parent over the subsidiary's business. "(W)here the major policies of the subsidiaries are directed by the parents, it would seem that there is a strong case for holding the directorships unlawful." United States v. Cleveland Trust Co., 392 F.Supp. 699, 712 (N.D.Ohio 1974), aff'd, 513 F.2d 633 (6th Cir. 1975), quoting Kramer, Interlocking Directorships and the Clayton Act after 35 Years, 59 Yale L.J. 1266, 1268 n.11 (1950). If the parent substantially controls the policies of its subsidiary, it may fairly be said, in the language of the competing corporations provision of Section 8, that the "business and location" of the parent include the business and location of the subsidiary.
 
 
 79
 The stipulations establish that in this case the parent bank holding companies control their bank subsidiaries in fact. The federal banking statutes establish such control as a matter of law. By definition, the business of a bank holding company is controlling subsidiary banks. The Bank Holding Company Act, 12 U.S.C. § 1841(a)(1), defines "bank holding company" as "any company which has control over any bank or over any company that is or becomes a bank holding company." Section 1841(a)(2) provides that a company controls a bank if the company has voting power over 25 percent of any class of the voting securities of the bank and controls the election of a majority of its directors. The statute establishes a conclusive presumption of control on the facts stipulated in this case.[78]
 
 
 80
 The banking provision of Section 8 prohibits only interlocks between one "bank, banking association, savings bank or trust company" and another, and does not refer to bank holding companies. Nonetheless, the Federal Reserve Board interpreted these provisions as prohibiting an interlock between a bank and a bank holding company if an interlock between the bank and any bank subsidiary of the bank holding company would be prohibited. The Board based this interpretation upon the fact that the affairs of bank holding companies and their bank subsidiaries are so closely identified and functionally related that the possibility of the abuse the banking provision of Section 8 was designed to guard against would be equally present whether the bank holding company or its bank subsidiary were involved. It would therefore frustrate the purpose of Congress to give cognizance to the separate corporate entities. The Board held that in order to effectuate the purpose of Congress, "(a) holding company whose principal activity is the ownership and control of banks, and each of its bank subsidiaries, should be considered as constituting together a single entity for the purposes (of the banking provisions) of Section 8."[79]
 
 
 81
 For the same reason, the competing corporations provision of Section 8 should be read to bar interlocks between a bank holding company whose principal activity is the ownership and control of banks and a nonbanking corporation with which the subsidiary bank of the bank holding company competes. Bank holding companies and their subsidiary banks are indistinguishable in terms of the purpose Congress sought to achieve.
 
 
 82
 The staff and agency reports relied upon by appellees are not to the contrary.[80] In addition to expressing concern about vertical interlocks, they question whether the statute covers "indirect interlocks" as, for example, when a director of corporation X serves as a director of corporation A and another director of X serves on the board of A's competitor B, creating an indirect interlock between A and B. The interlocks at issue here are not "indirect" in that sense. The competing corporations provision prohibits a person from serving as "a director in any two or more corporations" at the same time; here one person serves simultaneously as a director of both a bank holding company and an insurance company, and the question is merely whether the two corporations are, within the meaning of the statute, competitors. The cases relied upon by appellees are also unpersuasive.[81]IX.
 
 
 83
 The district court held that if Section 8 of the Clayton Act did prohibit interlocking directorates between competing banks and non-banks contrary to the district court's view, the interlocks involved in this case would not be excluded from Section 8 by Section 2(b) of the McCarran-Ferguson Act, 59 Stat. 34 (1945), as amended, 15 U.S.C. § 1012(b) (1976), which provides a limited exemption from the antitrust laws for the business of insurance.[82] Appellees filed a cross-appeal to preserve this issue. We agree with the district court.
 
 
 84
 The McCarran-Ferguson Act was adopted in response to the holding in United States v. South-Eastern Underwriter's Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944), "that insurance transactions were subject to federal regulation under the Commerce Clause, and that the antitrust laws, in particular, were applicable to them." SEC v. National Securities, Inc., 393 U.S. 453, 458, 89 S.Ct. 564, 567, 21 L.Ed.2d 668 (1969). The purpose of the McCarran-Ferguson Act "was stated quite clearly in its first section; Congress declared that 'the continued regulation and taxation by the several States of the business of insurance is in the public interest.' 59 Stat. 33 (1945), 15 U.S.C. § 1011." Id.
 
 
 85
 Section 2(b) of the McCarran-Ferguson Act provides that "(n)o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, (the Sherman Act, the Clayton Act, and the Federal Trade Commission Act) shall be applicable to the business of insurance to the extent that such business is not regulated by State law."[83]
 
 
 86
 Section 2(b) provides a limited antitrust exemption for conduct that is (1) "the business of insurance," and (2) "regulated by state law." Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. 205, 219, 99 S.Ct. 1067, 1077, 59 L.Ed.2d 261 (1979).[84]
 
 
 87
 The most obvious reason for rejecting a claim of immunity in this case is the absence of any state law regulating the challenged activity that might be impaired by application of Section 8 of the Clayton Act.
 
 
 88
 The courts have had some difficulty developing standards for determining whether activity is "regulated by State law" for the purposes of Section 2(b).[85] Whatever the test, however, the New York and New Jersey statutes upon which appellees rely clearly do not regulate the interlocking directorates challenged in this case. Nor would application of Section 8 of the Clayton Act to these interlocks "invalidate, impair, or supersede" these state statutes.
 
 
 89
 The New York Statute prohibits interlocking directorates between "two or more insurers ... engaged in writing directly the same lines of commerce in insurance" unless such interlocks do not lessen competition or create a monopoly "in the business of insurance."[86] The New Jersey statute prohibits interlocks between "competing insurers" which substantially lessen competition or create a monopoly "in the business of insurance ...."[87]
 
 
 90
 These statutes are part of the insurance codes of the two states; both deal exclusively with the insurance industry. They purport to regulate interlocking directorates between insurance companies affecting competition in the insurance business. They do not apply to interlocks between insurance companies and banks affecting competition in the extension of mortgage and real estate loans. No action against such interlocks would lie under these state statutes; application of the Clayton Act to such interlocks would in no way impair them. For these reasons alone, the McCarran-Ferguson Act does not bar application of Section 8 of the Clayton Act to the bank and insurance company interlocks involved in this case.[88]
 
 
 91
 This conclusion is supported by the general principle that coordinate federal and state authority should be accommodated when possible and the inferior law should be preempted only to the extent necessary to accomplish the purpose of the law that is supreme.[89]
 
 
 92
 It also is consistent with the purpose of the McCarran-Ferguson Act. The language and legislative history show clearly that Congress intended to create a partial antitrust immunity limited to the insurance industry.[90] To extend immunity under the Act to conduct "involv(ing) parties wholly outside the insurance industry," Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. at 231, 99 S.Ct. at 1083, would be contrary to this purpose and inconsistent with the canon requiring strict construction of antitrust exemptions. Id.
 
 
 93
 This is enough to dispose of appellees' McCarran-Ferguson claim. We note, however, though we do not decide, that McCarran-Ferguson immunity also may be unavailable for the independent reason that creation of interlocking directorates between banks and insurance companies may not be part of "the business of insurance" to which alone the statutory exemption applies.[91] The Supreme Court has emphasized that the McCarran-Ferguson exemption is invoked by state regulation of the "business of insurance" not the "business of insurance companies." Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. at 211, 99 S.Ct. at 1073; SEC v. National Securities, Inc., 393 U.S. at 459-60, 89 S.Ct. at 568. "Many aspects of insurance companies are regulated by state law, but are not the 'business of insurance.' " Group Life & Health Insurance Co. v. Royal Drug Co., 440 U.S. at 230 n.38, 99 S.Ct. at 1082 n.38. State statutes trigger antitrust immunity only to the extent they concern "the contract between the insurer and the insured," id. at 215, 99 S.Ct. at 1075, or involve "spreading and underwriting of a policyholder's risk." Id. at 211, 99 S.Ct. at 1073, see id. at 220-22, 99 S.Ct. at 1077-78. Appellees argue that selection of directors affects the status of insurance companies "as reliable insurers" which ultimately affects the relationship between the insurer and the insured, and is thus the "business of insurance." See SEC v. National Securities, Inc., 393 U.S. at 460, 89 S.Ct. at 568. A similar contention was rejected in Group Life, 440 U.S. at 216-17, 99 S.Ct. at 1075-76. But even if the argument were persuasive as applied to interlocking directorates between insurance companies, it would not follow that interlocks between banks and insurance companies, affecting competition in the credit market rather than the market for insurance and the relationship between insurance companies and borrowers rather than their policyholders, would qualify as the "business of insurance" within the meaning of the statute.[92]
 
 
 94
 REVERSED.
 
 KENNEDY, Circuit Judge, dissenting:
 
 95
 I respectfully dissent from that portion of the opinion which holds that section 8 of the Clayton Act does not exempt interlocking directorates between banks and non-banks which are competing entities. The principal reasons for my dissent are well-stated by Chief Judge Peckham in his thorough and persuasive opinion below, 422 F.Supp. 686 (N.D.Cal.1976), and I have little to add to that careful explanation of the statute, an explanation which in my view is entirely correct.
 
 
 96
 Chief Judge Browning's meticulous examination of both the statute and its history demonstrates that the question is a difficult one. My principal objection to the rhetoric of the majority opinion is that the reasonable and plausible arguments of the district court are for the most part labeled bare assertions, while, viewed against the legislative history of this statute, the same epithet could be applied to most of what the majority opinion contains. No doubt, the purpose of the statute is of principal importance in ascertaining the scope of ambiguous terms, but the broad and simple formulation of a purpose to promote competition is insufficient to resolve a case which turns upon words and concepts that are much more precise. The purpose of the statutory exemption obviously was to narrow the range of its coverage. In my view, had Congress intended the exemption to cover only pure bank interlocks, it would have used much different language to do so.
 
 
 97
 If, measured by the legislative purpose to promote competition, my interpretation of the exemption can be characterized as a loophole, so be it. The lapse has been well-known to the business community, and there has been widespread reliance on the assumption that the statute does not cover these interlocks. Congress has not changed the statute, although it has considered the problem expressly. Legislative lacunae do not demand judicial correction, even if that correction invokes the broad doctrinal scheme that prompted the legislature to act initially. The judiciary is not a repair shop to streamline statutory structures, especially when what is perceived as an imperfection in the design is in fact the result of compromises which are the very essence of the legislative process. Errors absolutely unforeseen or wholly contrary to the legislative purpose might give the judiciary somewhat freer reign, but cf. TVA v. Hill, 437 U.S. 153, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978), but a question over which there has been as much speculation and warning as this one neither requires nor permits judicial intervention to patch it up. The majority's strained efforts in its comprehensive opinion serve only to highlight and underscore the existence of a legislative intent to compromise and to narrow the statutory coverage, the very opposite of the premise ascribed to the Congress, a premise which is the sole basis for the majority's opinion.
 
 
 98
 With these few observations, I file this dissent to parts 1 through 8 of the majority's opinion. I concur in the reasoning and conclusions of the court in its interpretation of the McCarran-Ferguson Act.
 
 
 
 *
 Honorable A. Sherman Christensen, Senior Judge, United States District Court for the District of Utah, sitting by designation
 
 
 [1]
 Section 8 has been amended often. The changes do not affect this case. The present statute reads as follows:
 (Para 1)
 No private banker or director, officer, or employee of any member bank of the Federal Reserve System or any branch thereof shall be at the same time a director, officer, or employee of any other bank, banking association, savings bank, or trust company organized under the National Bank Act or organized under the laws of any State or of the District of Columbia, or any branch thereof, except that the Board of Governors of the Federal Reserve System may by regulation permit such service as a director, officer, or employee of not more than one other such institution or branch thereof; but the foregoing prohibition shall not apply in the case of any one or more of the following or any branch thereof:
 (1) A bank, banking association, savings bank, or trust company, more than 90 per centum of the stock of which is owned directly or indirectly by the United States or by any corporation of which the United States directly or indirectly owns more than 90 per centum of the stock.
 (2) A bank, banking association, savings bank, or trust company which has been placed formally in liquidation or which is in the hands of a receiver, conservator, or other official exercising similar functions.
 (3) A corporation, principally engaged in international or foreign banking or banking in a dependency or insular possession of the United States which has entered into an agreement with the Board of Governors of the Federal Reserve System pursuant to sections 601 to 604a of Title 12.
 (4) A bank, banking association, savings bank, or trust company, more than 50 per centum of the common stock of which is owned directly or indirectly by persons who own directly or indirectly more than 50 per centum of the common stock of such member bank.
 (5) A bank, banking association, savings bank, or trust company not located and having no branch in the same city, town, or village as that in which such member bank or any branch thereof is located, or in any city, town, or village contiguous or adjacent thereto.
 (6) A bank, banking association, savings bank, or trust company not engaged in a class or classes of business in which such member bank is engaged.
 (7) A mutual savings bank having no capital stock.
 (Para 2)
 Until February 1, 1939, nothing in this section shall prohibit any director, officer, or employee of any member bank of the Federal Reserve System, or any branch thereof, who is lawfully serving at the same time as a private banker or as a director, officer, or employee of any other bank, banking association, savings bank, or trust company, or any branch thereof, on August 23, 1935, from continuing such service.
 (Para 3)
 The Board of Governors of the Federal Reserve System is authorized and directed to enforce compliance with this section, and to prescribe such rules and regulations as it deems necessary for that purpose.
 (Para 4)
 No person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, other than banks, banking associations, trust companies, and common carriers subject to the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. The eligibility of a director under the foregoing provision shall be determined by the aggregate amount of the capital, surplus, and undivided profits, exclusive of dividends declared but not paid to stockholders, at the end of the fiscal year of said corporation next preceding the election of directors, and when a director has been elected in accordance with the provisions of this Act it shall be lawful for him to continue as such for one year thereafter.
 (Para 5)
 When any person elected or chosen as a director or officer or selected as an employee of any bank or other corporation subject to the provisions of this Act is eligible at the time of his election or selection to act for such bank or other corporation in such capacity his eligibility to act in such capacity shall not be affected and he shall not become or be deemed amenable to any of the provisions hereof by reason of any change in the affairs of such bank or other corporation from whatsoever cause, whether specifically excepted by any of the provisions hereof or not, until the expiration of one year from the date of his election or employment.
 15 U.S.C. § 19 (1976) (emphasis added)
 The first three paragraphs are relevant to this case only insofar as they shed light on the meaning of the fourth. The Board of Governors of the Federal Reserve System regards the comprehensive Interlocks Act, 12 U.S.C. §§ 3201 et seq. (Supp. III 1979), as having supplanted the first three paragraphs. 12 C.F.R. § 212.7 (1980).
 Section 8 as enacted contained four unnumbered paragraphs, the third of which covered competing corporations. To avoid confusion, the various paragraphs will be referred to in this opinion by subject "the banking paragraphs" or the "competing corporations paragraph" rather than by number. The original statute read as follows:
 (Para 1)
 That from and after two years from the date of the approval of this Act no person shall at the same time be a director or other officer or employee of more than one bank, banking association or trust company, organized or operating under the laws of the United States, either of which has deposits, capital, surplus, and undivided profits aggregating more than $5,000,000; and no private banker or person who is a director in any bank or trust company, organized and operating under the laws of a State, having deposits, capital, surplus, and undivided profits aggregating more than $5,000,000, shall be eligible to be a director in any bank or banking association organized or operating under the laws of the United States. The eligibility of a director, officer, or employee under the foregoing provisions shall be determined by the average amount of deposits, capital, surplus, and undivided profits as shown in the official statements of such bank, banking association, or trust company filed as provided by law during the fiscal year next preceding the date set for the annual election of directors, and when a director, officer, or employee has been elected or selected in accordance with the provisions of this Act it shall be lawful for him to continue as such for one year thereafter under said election or employment.
 (Para 2)
 No bank, banking association or trust company, organized or operating under the laws of the United States, in any city or incorporated town or village of more than two hundred thousand inhabitants, as shown by the last preceding decennial census of the United States, shall have as a director or other officer or employee any private banker or any director or other officer or employee of any other bank, banking association or trust company located in the same place: Provided, That nothing in this section shall apply to mutual savings banks not having a capital stock represented by shares: Provided further, That a director or other officer or employee of such bank, banking association, or trust company may be a director or other officer or employee of not more than one other bank or trust company organized under the laws of the United States or any State where the entire capital stock of one is owned by stockholders in the other: And provided further, That nothing contained in this section shall forbid a director of class A of a Federal reserve bank, as defined in the Federal Reserve Act, from being an officer or director or both an officer and director in one member bank.
 (Para 3)
 That from and after two years from the date of the approval of this Act no person at the same time shall be a director in any two or more corporations, any one of which has capital, surplus, and undivided profits aggregating more than $1,000,000, engaged in whole or in part in commerce, other than banks, banking associations, trust companies and common carriers subject to the Act to regulate commerce, approved February fourth, eighteen hundred and eighty-seven, if such corporations are or shall have been theretofore, by virtue of their business and location of operation, competitors, so that the elimination of competition by agreement between them would constitute a violation of any of the provisions of any of the antitrust laws. The eligibility of a director under the foregoing provision shall be determined by the aggregate amount of the capital, surplus, and undivided profits, exclusive of dividends declared by not paid to stockholders, at the end of the fiscal year of said corporation next preceding the election of directors, and when a director has been elected in accordance with the provisions of this Act it shall be lawful for him to continue as such for one year thereafter.
 (Para 4)
 When any person elected or chosen as a director or officer or selected as an employee of any bank or other corporation subject to the provisions of this Act is eligible at the time of his election or selection to act for such bank or other corporation in such capacity his eligibility to act in such capacity shall not be affected and he shall not become or be deemed amenable to any of the provisions hereof by reason of any change in the affairs of such bank or other corporation from whatsoever cause, whether specifically excepted by any of the provisions hereof or not, until the expiration of one year from the date of his election or employment.
 Clayton Act, ch. 323 § 8, 38 Stat. 732-33 (1914).
 
 
 [2]
 The complaint in United States v. Crocker National Corp. alleged that each of three individuals was a director of the Crocker National Corporation, Crocker National Bank, and of either the Equitable Life Assurance Society of the United States, Metropolitan Life Insurance Company or Mutual Life Insurance Company of New York. The complaint in United States v. BankAmerica Corp. alleged that a director of Bank of America National Trust and Savings Association and of its holding company, BankAmerica Corporation, and a director of Bankers Trust Company and of its holding company, Bankers Trust New York Corporation, were also directors of Prudential Insurance Company. The individual serving as a director of Prudential, BankAmerica and Bank of America resigned from the boards of the bank holding company and its subsidiary bank when notified by the government of its intent to file suit. After the filing of the complaint, the individual serving as a director of Crocker National Corporation, Crocker National Bank, and Equitable Life agreed to a consent judgment requiring that he resign his directorship in the bank and bank holding company or in Equitable Life
 
 
 [3]
 On cross-appeal, appellees argue that Section 8 applies only to individual directors and not to corporations. The Supreme Court has left this question unresolved. United States v. W. T. Grant Co., 345 U.S. 629, 634 n. 9, 73 S.Ct. 894, 898 n. 9, 97 L.Ed. 1303 (1953). The Second Circuit has construed the section as covering both corporations and individuals, SCM Corp. v. Federal Trade Commission, 565 F.2d 807, 811 (2d Cir. 1977). We need not reach the question. As the district court noted, and as conceded below, the district court had the power under Section 15 of the Clayton Act, 15 U.S.C. § 25, to enjoin the corporations as a means of shaping appropriate relief against violations by individuals. United States v. Crocker National Corp., 422 F.Supp. 686, 705-06 (N.D.Cal.1976)
 
 
 [4]
 The district court said:
 (I)t is readily apparent to the court, that all of the four limiting clauses apply to both corporations involved in an interlock, except for the first clause which by its own specific terms may be satisfied by "any one of" the two interlocked corporations. Hence, it is clear then that both interlocked corporations must satisfy clause 2 that is, they must both be engaged in whole or in part in commerce; that both corporations must satisfy clause 4 that is, they must be competitors; and finally and most significantly, that both corporations must satisfy clause 3 that is, they must both be other than banks, banking associations, trust companies and common carriers.
 
 
 [422]
 F.Supp. 686, 690 (N.D.Cal.1976)
 
 
 [5]
 See, e.g., In re Perpetual Federal Savings & Loan Ass'n, 90 F.T.C. 608, 636-37 (1977), vacated on other grounds, 94 F.T.C. 401 (1979)
 
 
 [6]
 See Part II infra
 
 
 [7]
 See text accompanying note 46. Section 10 reads in full:
 That after two years from the approval of this Act no common carrier engaged in commerce shall have any dealings in securities, supplies or other articles of commerce, or shall make or have any contracts for construction or maintenance of any kind, to the amount of more than $50,000, in the aggregate, in any one year, with another corporation, firm, partnership or association when the said common carrier shall have upon its board of directors or as its president, manager or as its purchasing or selling officer, or agent in the particular transaction, any person who is at the same time a director, manager or purchasing or selling officer of, or who has any substantial interest in, such other corporation, firm, partnership or association, unless and except such purchases shall be made from, or such dealings shall be with, the bidder whose bid is the most favorable to such common carrier, to be ascertained by competitive bidding under regulations to be prescribed by rule or otherwise by the Interstate Commerce Commission. No bid shall be received unless the name and address of the bidder or the names and addresses of the officers, directors and general managers thereof, if the bidder be a corporation, or of the members, if it be a partnership or firm, be given with the bid.
 Any person who shall, directly or indirectly, do or attempt to do anything to prevent anyone from bidding or shall do any act to prevent free and fair competition among the bidders or those desiring to bid shall be punished as prescribed in this section in the case of an officer or director.
 Every such common carrier having such transactions or making any such purchases shall within thirty days after making the same file with the Interstate Commerce Commission a full and detailed statement of the transaction showing the manner of the competitive bidding, who were the bidders, and the names and addresses of the directors and officers of the corporations and the members of the firm or partnership bidding; and whenever the said commission shall, after investigation or hearing, have reason to believe that the law has been violated in and about the said purchases or transactions it shall transmit all papers and documents and its own views or findings regarding the transaction to the Attorney General.
 If any common carrier shall violate this section it shall be fined not exceeding $25,000; and every such director, agent, manager or officer thereof who shall have knowingly voted for or directed the act constituting such violation or who shall have aided or abetted in such violation shall be deemed guilty of a misdemeanor and shall be fined not exceeding $5,000, or confined in jail not exceeding one year, or both, in the discretion of the court.
 15 U.S.C. § 20 (1976).
 
 
 [8]
 See notes 48-59 and accompanying text
 
 
 [9]
 Jones, Historical Development of the Law of Business Competition, 36 Yale L.J. 351, 376-77 (1927)
 
 
 [10]
 Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 355, 42 S.Ct. 360, 362, 66 L.Ed. 653 (1922); United Shoe Machinery Corp. v. U. S., 258 U.S. 451, 460, 42 S.Ct. 363, 366, 66 L.Ed. 708 (1922); United States v. E. I. Du Pont De Nemours & Co., 353 U.S. 586, 597, 77 S.Ct. 872, 879, 1 L.Ed.2d 1057 (1957); E. Kintner, Legislative History of the Federal Antitrust Laws and Related Statutes 989 (1978)
 
 
 [11]
 The theory of the Clayton Act was stated in the report of the Judiciary Committee of the Senate:
 It is not proposed by the bill or amendments to alter, amend, or change in any respect the original Sherman Antitrust Act of July 2, 1890. The purpose is only to supplement that act and the other antitrust acts referred to in section 1 of the bill. Broadly stated, the bill, in its treatment of unlawful restraints and monopolies, seeks to prohibit and made unlawful certain trade practices which, as a rule, singly and in themselves, are not covered by the act of July 2, 1890, or other existing antitrust acts, and thus, by making these practices illegal, to arrest the creation of trusts, conspiracies, and monopolies in their incipiency and before consummation. Among other of these trade practices which are denounced and made unlawful may be mentioned discrimination in prices for the purpose of wrongfully injuring or destroying the business of competitors; exclusive and tying contracts; holding companies; and interlocking directorates.
 S.Rep.No.698, 63d Cong., 2d Sess. 1 (1914). See also Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 42 S.Ct. 360, 362, 66 L.Ed. 653 (1922); SCM Corp. v. Federal Trade Commission, 565 F.2d 807, 811 (2d Cir. 1977); United States v. Sears, Roebuck & Co., 111 F.Supp. 614, 616 (S.D.N.Y.1953) (Weinfeld, J.); In re Perpetual Federal Savings & Loan Ass'n, supra, 90 F.T.C. at 653-65; Jones, supra note 9, at 376-77.
 
 
 [12]
 K. Porter & D. Johnson, National Party Platforms, 1840-1964 146, 169 (1966)
 
 
 [13]
 Travers, Interlocks in Corporate Management and the Antitrust Laws, 46 Texas L.Rev. 819, 827 (1968)
 
 
 [14]
 Concentration of Control of Money and Credit, H.R.Rep.No.1593, 62d Cong., 3d Sess. 140 (1913) ("Pujo Report"). See also Investigation of United States Steel Corp., H.R.Rep.No.1127, 62d Cong., 2d Sess. 209-10 (1912) ("Stanley Report")
 
 
 [15]
 As quoted in H.R.Rep.No.627, Pt. 1, 63d Cong., 2d Sess. 17-18 (first emphasis in original; second emphasis added)
 
 
 [16]
 Tentative Bill by Mr. Clayton, 63d Cong., 2d Sess. (No. 3 Committee Print) reprinted in E. Kintner, supra note 10, at 1077-78
 
 
 [17]
 H.R.15657 as Reported by the House Committee on the Judiciary, 63d Cong. 2d Sess., May 6, 1914, reprinted in E. Kintner, supra note 10, at 1163-81. As restructured by the Committee, the interlocking directorate provisions became Section 9. Although what is now Section 8 was numbered Section 9 throughout most of the legislative consideration, it is referred to throughout this opinion as Section 8
 
 
 [18]
 H.R.Rep.No.627 at 18
 
 
 [19]
 Id
 
 
 [20]
 Id. at 19
 
 
 [21]
 Id. at 19-20
 
 
 [22]
 See note 10 and accompanying text
 
 
 [23]
 TRW, supra at 947; United States v. Sears, Roebuck & Co., 111 F.Supp. 614, 616-17 (S.D.N.Y.1953)
 
 
 [24]
 H.R.Rep.No.627, Pt. 2 at 8 (minority views)
 
 
 [25]
 Travers, supra note 13, at 843-44. See also Note, Clayton Act Prohibition of Interlocking Directorates in Industrial or Commercial Corporations, 54 Colum.L.Rev. 130, 131 (1954); Report of the Federal Trade Commission on Interlocking Directorates, H.R.Doc.No.652, 81st Cong., 2d Sess. 10 (1951) ("(B)ased on the practical certainty that an interlocking directorate between competitors had an adverse effect upon competition, (Section 8) does not require for its enforcement any proof that in the particular instance the expected effect actually exists.")
 
 
 [26]
 51 Cong.Rec. 9091 (1914) (remarks of Rep. Mitchell)
 
 
 [27]
 See id. (remarks of Rep. Mitchell); id. at 9181 (Rep. Byrnes); 9186 (Rep. Helvering); 9261 (Rep. McGillicuddy); 9271 (Rep. Carlin); 9541 (Rep. Henry); 9554 (Rep. Barkley); 9576 (Rep. Carr); 9600-02, 9605-06 (various Representatives). But see id. at 9085 (remarks of Rep. Madden opposing the prohibition)
 The only amendments to the interlock proposals offered in the House (other than a minor change in the civil penalty) related to the bar against interlocking relationships between banks, and reflected a minority view that such relationships between small banks in local communities should not be prohibited. These amendments were defeated, 51 Cong.Rec. 9600-07. However, the basic objective was achieved in Conference by increasing to $5,000,000 the amount of deposits, capital, surplus, and undivided profits one of the banks must hold before the prohibition applies. See notes 44-45 and accompanying text.
 
 
 [28]
 51 Cong.Rec 9554 (1914) (remarks of Rep. Barkley)
 
 
 [29]
 S.Rep.No.698, 63d Cong., 2d Sess. 1 (1914), quoted at note 11 supra
 
 
 [30]
 Id. at 48
 
 
 [31]
 Id. Appellees argue the Senate's reasoning shows that the portions the Senate left intact in particular the competing corporations paragraph were not intended to reach bank/non-bank interlocks. This argument reads too much into the Senate's action. The position that bank/bank interlocks should be regulated by a banking bill does not necessarily entail the belief that interlocks between a non-bank and a bank should be so treated half the subject matter of such interlocks is in the "commercial" realm
 
 
 [32]
 51 Cong.Rec. 14320 (1914)
 
 
 [33]
 Id. at 14535
 
 
 [34]
 United States v. Sears, Roebuck & Co., 111 F.Supp. 614, 616 (S.D.N.Y.1953). See TRW, supra, at 946
 
 
 [35]
 In re Perpetual Federal Savings & Loan Ass'n, supra, 90 F.T.C. at 652-54
 
 
 [36]
 SCM Corp. v. FTC, 565 F.2d 807, 811 (2d Cir. 1977)
 
 
 [37]
 See note 20 and accompanying text
 
 
 [38]
 See Part II supra
 
 
 [39]
 In re Perpetual Federal Savings & Loan Ass'n, supra, 90 F.T.C. at 656. Summarizing Congress' general approach to interlocking directorates, the Commission said:
 What emerges from the mosaic of federal anti-interlock statutes, foremost among which is Section 8, is a clear antipathy toward interlocking directorates. An examination of these statutes, summarized in respondent's brief, ... reveals a general prohibition against horizontal interlocks except to the extent expressly permitted by statute or expressly made subject to federal regulation.
 Id.
 
 
 [40]
 See generally United States v. Philadelphia National Bank, 374 U.S. 321, 348, 83 S.Ct. 1715, 1733, 10 L.Ed.2d 915 (1963); Allen Bradley Co. v. Local Union No. 3, 325 U.S. 797, 808-10, 65 S.Ct. 1533, 1539-40, 89 L.Ed. 1939 (1945); United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 553-61, 64 S.Ct. 1162, 1173-78, 88 L.Ed. 1440 (1944)
 
 
 [41]
 See note 5 and accompanying text
 
 
 [42]
 See notes 31-33 and accompanying text
 
 
 [43]
 422 F.Supp. at 700
 
 
 [44]
 51 Cong.Rec. 14321
 
 
 [45]
 Id. at 16271-72
 
 
 [46]
 See S.Rep.No.698, 63d Cong., 2d Sess. 47-48 (1914); Minneapolis & St. Louis Ry. v. United States, 361 U.S. 173, 190, 80 S.Ct. 229, 239, 4 L.Ed.2d 223 (1959)
 
 
 [47]
 FTC v. Fred Meyer, Inc., 390 U.S. 341, 349, 88 S.Ct. 904, 908, 19 L.Ed.2d 1222 (1968). See text following note 36
 
 
 [48]
 Hearings on Trust Legislation Before the House Committee on the Judiciary, 63d Cong., 2d Sess. 681-82 (1914)
 
 
 [49]
 Id. at 823, 922-26
 
 
 [50]
 H.R.Rep.No.627, Pt. 1, 63d Cong., 2d Sess. 18 (1914)
 
 
 [51]
 Id. at 19; Trust Hearings, supra note 48, at 830, 834, 836; S.Rep.No.698, 63d Cong., 2d Sess. 47 (1914); 51 Cong.Rec. 9604 (1914)
 
 
 [52]
 H.R.Rep.No.627 at 18
 
 
 [53]
 See, e. g., 51 Cong.Rec. 9186 (remarks of Rep. Helvering); 9554 (Rep. Barkley); 14536 (Sen. Cummings)
 
 
 [54]
 See, e. g., Hearings on Trust Legislation Before the House Comm. on the Judiciary, 63d Cong., 2d Sess. 834 (1914) (testimony of Mr. Untermyer that banks do not engage in interstate commerce). See also note 58 infra
 
 
 [55]
 See United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 553-561, 64 S.Ct. 1162, 1173-1178, 88 L.Ed. 1440 (1944); Transamerica Corp. v. Board of Governors, 206 F.2d 163, 166 (3d Cir. 1953)
 
 
 [56]
 51 Cong.Rec. 9604 (1914)
 
 
 [57]
 Id. at 9272
 
 
 [58]
 Representative Mann raised a point of order against the Conference Report arguing that because the House and Senate had not disagreed as to the competing corporations paragraph of Section 8, the conferees were without authority to make substantive changes in the text and therefore had exceeded their authority by agreeing to amend the exclusionary clause to include banks. 31 Cong.Rec. 16270-72. The conferees responded by explaining that the purpose of the insertion was to make it clear that the competing corporations paragraph did not apply to the bank interlocks expressly dealt with in the preceding paragraphs. They argued that the amendment was only technical and worked no substantive change because the statute would have been interpreted in the same way without the insertion. Representative Webb, a House conferee, said:
 The conference did put in "banks and banking associations," in order to make perfectly clear what in my opinion is already clear; because in the preceding paragraph we had passed a section with reference to interlocking directorates of banks, and there we made the limitation $5,000,000. Now, it would be idiotic to say that we included also banks and banking associations in the paragraph referring to industrial corporations; and in order to make the paragraph perfectly plain, we inserted "other than banks and banks (sic) associations," and common carriers, which had no effect upon the meaning of that section.... (I)f you will read the section preceding (paragraph four), in which we take care of banks and make the limitation $5,000,000, (you) can never conclude, even though the words which (Mr. Mann) excepts to are stricken out, that the interlocking directorates provision with reference to industrials was also intended to cover banks, because we have already taken care of banks in a former section or a former paragraph, and we simply put into this section which my friend objects to that which is necessarily implied and expressed in the bill itself.
 Id. at 16271.
 Representative Mann was not satisfied. In the only clear reference in the legislative proceedings to the problem presented in this case, he argued that addition of banks to the exclusionary clause was substantive because before the amendment the competing corporations provisions prohibited interlocks between banks and non-banks, and after the amendment it did not. Id. at 16272-73.
 Before the proponents of the bill could respond the Speaker ruled against Representative Mann's point of order. There was therefore no concession by proponents that the amendment of the exclusionary clause went any further than to exclude from the competing corporations provision the bank interlocks that were the subject matter of the restored provision prohibiting bank interlocks that is, interlocks between banks. The Speaker's ruling appears to have been based upon the premise that this was the amendment's effect. Id. at 16273.
 In the course of the exchange Representative Sherley indicated that banks might not be within the competing corporations provision because they "are not such corporations as 'are or shall have been theretofore, by virtue of their business and location of operation, competitors' with industrial corporations." Id. at 16271. As noted earlier, however, failure to anticipate that banks might sometimes compete with non-banking corporations does not suggest an affirmative intention to exempt interlocking directorships from a generally phrased prohibition. Cf. United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).
 
 
 [59]
 See NLRB v. Fruit Packers, 377 U.S. 58, 66, 84 S.Ct. 1063, 1068, 12 L.Ed.2d 129 (1964) ("But we have often cautioned against the danger, when interpreting a statute, of reliance upon the views of its legislative opponents. In their zeal to defeat a bill, they understandably tend to overstate its reach.")
 
 
 [60]
 Interlocks in Corporate Management, Staff Report of the House Committee on the Judiciary (Antitrust Subcommittee), 89th Cong., 1st Sess. 25-26 (Comm. print 1965), described the competing corporations paragraph as relating to "industrial and commercial" corporations and containing "no prohibition ... against ... interlocks between the banking organizations and other types of corporations." But the report does not examine the statutory language, structure or legislative history, and later quotes a statement from the report of the special President's Committee on Financial Institutions (Heller Report) explicitly recognizing the ambiguity of the paragraph in this respect. See id. at 110
 Control of Commercial Banks and Interlocks Among Financial Institutions, Staff Report of the Subcomm. on Domestic Finance of the House Comm. on Banking and Currency, 90th Cong., 1st Sess. 39-40 (Subcomm. print 1967) states that the banking section "does not apply to interlocks between commercial banks and competing financial institutions, such as mutual savings banks, insurance companies, and small loan companies." But this statement addressed limitations of the banking provisions, not of the competing corporations provision, and contains no discussion of the competing corporations provision or of the exclusionary clause itself.
 The language quoted by the district court (422 F.Supp. at 691) from Commercial Banks and their Trust Activities: Emerging Influence on the American Economy, Staff Report of the Subcomm. on Domestic Finance of the House Comm. on Banking and Currency, 90th Cong., 2d Sess. 11 (Subcomm. print 1968), concerns vertical interlocks and thus is not germane to the problem of horizontal interlocks between competing corporations or the scope of the exclusionary clause.
 However, a passage in the summary of recommendations at the beginning of the latter report does state that Section 8 does not apply to interlocks between banks and competing financial institutions, including insurance companies, that are not banks, and terms this perceived omission "a major loophole." Id. at 10. This is, however, a bare statement unsupported by any discussion or analysis of either the competing corporations provision or the exclusionary clause, and refers only to a similarly bare assertion in the text of the report. Id. at 925-26.
 
 
 [61]
 Substantially identical amendment legislation failed to be enacted on several occasions. See H.R. 11572, 89th Cong., 1st Sess. (1965); H.R. 2509, 90th Cong., 1st Sess. (1967); H.R. 2346, 91st Cong., 1st Sess. (1969); H.R. 3245, 92d Cong., 1st Sess. (1971); H.R. 5700, 92d Cong., 1st Sess. (1971); H.R. 13581, 93d Cong., 2d Sess. (1974); H.R. 14997, 93d Cong., 2d Sess. (1974); H.R. 4406, 94th Cong., 1st Sess. (1975)
 
 
 [62]
 See also Order of Ry. Conductors v. Swan, 329 U.S. 520, 529, 67 S.Ct. 405, 409, 91 L.Ed. 471 (1947)
 
 
 [63]
 See United States v. Southwestern Cable Co., 392 U.S. 157, 170, 88 S.Ct. 1994, 2001, 20 L.Ed.2d 1001 (1968)
 
 
 [64]
 See H.R.Rep.No.150, 73d Cong., 1st Sess. (1933); S.Rep. No. 77, 73d Cong., 1st Sess. (1933)
 
 
 [65]
 In related context the Federal Trade Commission disposed of the argument based on Section 8A as follows:
 Nor do we ascribe any significance to the brief existence of Section 8A of the Clayton Act, which was added by the Banking Act of 1933, ch. 89, §§ 32, 33, 48 Stat. 194-95, and then repealed by the Banking Act of 1935, ch. 614, § 329, 48 Stat. 717-18. Section 8A prohibited director, officer or employee interlocks between banks and corporations (other than mutual savings banks) which made loans "secured by stock or bond collateral." Although Perpetual contends that the enactment and repeal of Section 8A lead to the conclusion that Congress recognized that the original Section 8 never reached bank/non-bank interlocks, that it enacted Section 8A to bridge that statutory gap, and that the repeal of Section 8A restored the prior situation, again legalizing such interlocks, these conclusions are unwarranted. The enactment and repeal of Section 8A took place against the backdrop of Congressional concern about the diversion of bank funds into speculative securities, reasons wholly removed from the competitive concerns embodied in the policy of Section 8. Since neither the passage nor the repeal of Section 8A expressed any Congressional intent to authorize the type of interlocks presented in this case, they do not affect our holding that such interlocks violate Section 5.
 In re Perpetual Federal Savings & Loan Ass'n, supra, 90 F.T.C. at 656 n.15.
 
 
 [66]
 See Parts II & III supra
 
 
 [67]
 422 F.Supp. at 702
 
 
 [68]
 Letter to Senator Proxmire, September 28, 1976, cited in In re Perpetual Savings & Loan Ass'n, supra, 90 F.T.C. at 622
 
 
 [69]
 Hearings on H.R. 5700 Before the House Comm. on Banking and Currency, 92nd Cong., 1st Sess. 278 (1971)
 
 
 [70]
 See Part II supra
 
 
 [71]
 H.R.Rep. No. 627, 63d Cong., 2d Sess. 19 (1914)
 
 
 [72]
 United States v. Crocker Nat. Corp., 422 F.Supp. 686, 690 (N.D.Cal.1976)
 
 
 [73]
 The district court (422 F.Supp. at 690-91) relied upon an introductory paragraph quoted from the Report of the Federal Trade Commission on Interlocking Directorates, H.R. Doc. No. 652, 81st Cong., 2d Sess. 10 (1950). If the paragraph is considered in the context of the more specific material it introduces, it is not clear whether the authors were stating that interlocks between banks and non-banking corporations are not barred or that vertical interlocks between banks and the corporations with which they do business are not barred
 The emphasis in the report on vertical bank/non-bank interlocks and the lack of discussion of horizontal interlocks suggests that the reference is only to vertical interlocks. For example, the report states that the "loophole" for vertical interlocks raises problems such as "preferential access to credit for the industrial corporation," and a concomitant substantial handicap to other concerns dependent upon that bank for service. Id. at 15; see id. at 25, 27, 36. Although the report documents vertical interlocks between commercial and financial companies in a number of industries, nowhere does it directly address interlocks between banks and their non-bank competitors.
 The testimony of former FTC Chairman Engman reported in Hearings on Corporate Disclosure Before the Subcommittee on Budgeting, Management, and Expenditures and the Subcommittee on Intergovernmental Relations, Senate Committee on Government Operations, 93d Cong., 2d Sess. pt. 2 (1974), also cited by the district court, clearly applies only to vertical interlocks. Mr. Engman addresses the subject of interlocks between "financial institutions, particularly commercial banks, (and) commercial corporations" but his testimony on this subject is limited to "vertical interlock(s) between borrower and lender" which might establish "preferential access to credit" and when multiplied, might lead to the "representation of competitors on the same bank boards ... (which) may lead to exchanges of information between competitors, collusive activity, and possible communities of interest strong enough to provide a substantial handicap to nonrepresented companies dependent upon those banks for essential services." Id. at 901. This testimony has no bearing upon the direct bank/non-bank interlocks between competitors at issue here.
 A speech by James Halverson, Director of the Bureau of Competition, cited by appellees, is irrelevant for the same reason. See Halverson, "Interlocking Directorates a Government View," BNA A.T.R.R. No. 708 at E-1 through E-7 (April 8, 1975).
 
 
 [74]
 Former Assistant Attorney General Kauper wrote that Section 8 "may not be directly applicable" to interlocks between competing financial institutions and insurance companies, see American Metal Market, Vol. 81, No. 137, July 16, 1974 (emphasis added)
 A 1966 report by the President's Committee on Financial Institutions also acknowledged the ambiguity, stating that the
 exemption was presumably inserted in order to omit from coverage of the second part of section 8 those relationships among banks already covered by the first part. It might be interpreted, however, as exempting an interlocking directorate between a bank and a competing financial institution even though the latter type of interlocking relationship is not covered by the first part of section 8. The Committee believes that the Clayton Act needs clarification in this respect.
 Report of the Committee on Financial Institutions to the President of the United States 53 (1963) (emphasis in original).
 
 
 [75]
 See United States v. Du Pont & Co., 353 U.S. 586, 590, 77 S.Ct. 872, 875, 1 L.Ed.2d 1057 (1957)
 
 
 [76]
 See 422 F.Supp. at 688
 
 
 [77]
 See Kennecott Copper Corp. v. Curtiss-Wright Corp., 584 F.2d 1195, 1205 (2d Cir. 1978) (reserving issue of whether statute would cover "parent corporation that closely controls and dictates the policies of its subsidiary.")
 
 
 [78]
 See 12 C.F.R. § 225.2(a) (1980). See also Comptroller's Manual for National Banking, Rule 7.7376(d) (applying to operating subsidiaries all federal banking laws applicable to their parents)
 
 
 [79]
 See 12 C.F.R. § 212.102(d) (1976). The Board relied upon earlier Board determinations treating a bank holding company and its bank subsidiary as a single entity under Section 8 of the Clayton Act, see 12 C.F.R. § 212.101 (1976), and also under § 32 of the Banking Act of 1933, 12 U.S.C. § 78 (1976), see 12 C.F.R. § 218.114 (1976)
 
 
 [80]
 See Staff of House Comm. on the Judiciary (Antitrust Subcomm.), 89th Cong., 1st Sess., Report on Interlocks in Corporate Management 26 (Comm. print 1965); Report of the Federal Trade Commission on Interlocking Directorates, H.Doc. No. 652, 81st Cong., 2d Sess. 14-15 (1951)
 
 
 [81]
 Contrary to appellees' suggestion, In re Penn Central Securities Litigation, 367 F.Supp. 1158 (E.D.Pa.1973), does not hold that a parent and subsidiary can never be treated as a single entity under section 8 despite a high degree of control by the parent. The district court said it was not convinced interlocks between subsidiaries of the same parent could never violate Section 8, but found the Section 8 issue to be moot. See id. at 1168. The statement in Paramount Pictures Corp. v. Baldwin-Montrose Chemical Co., 1966 Trade Cas. P 71,678, p. 82,065 (S.D.N.Y.) that a "subsidiary or parent corporations of those corporations in which there is an allegedly infringing interlocking directorate are not to be considered in determining whether competition exists between the directed corporations," was made with respect to a situation where the activities of some affiliated companies were "completely unrelated" and any competition between the subsidiaries was de minimus. Moreover the section 8 claim was found to be moot
 The statement in United States v. Sears, Roebuck & Co., 165 F.Supp. 356, 358 (S.D.N.Y.1958) that "(t)he provisions of the decree are not limited to the language of Section 8 ... which by its terms is applicable to directors of corporations engaged in competition" is dictum not affecting the decision, and in any event does not imply, as appellees argue, that Section 8 is categorically inapplicable to situations where the competition between the interlocked companies arises solely from competition between one of those companies and the other's subsidiary.
 
 
 [82]
 See United States v. Crocker National Corp., supra, 422 F.Supp. at 706
 
 
 [83]
 The Act provides in relevant part:
 Congress hereby declares that the continued regulation and taxation by the several States of the business of insurance is in the public interest, and that silence on the part of the Congress shall not be construed to impose any barrier to the regulation or taxation of such business by the several States.
 Sec. 2(a) The business of insurance, and every person engaged therein, shall be subject to the laws of the several States which relate to the regulation or taxation of such business.
 (b) No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance: Provided, That after June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, as amended, shall be applicable to the business of insurance to the extent that such business is not regulated by State Law....
 Sec. 3(a) Until June 30, 1948, the Act of July 2, 1890, as amended, known as the Sherman Act, and the Act of October 15, 1914, as amended, known as the Clayton Act, and the Act of September 26, 1914, known as the Federal Trade Commission Act, and the Act of June 19, 1936, known as the Robinson-Patman Anti-Discrimination Act, shall not apply to the business of insurance or to acts in the conduct thereof.
 (b) Nothing contained in this (Act) shall render the said Sherman Act inapplicable to any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation.
 15 U.S.C. §§ 1011-1013 (1976).
 
 
 [84]
 Section 3(b) of the Act also excludes from the exemption "any agreement to boycott, coerce, or intimidate, or act of boycott, coercion, or intimidation." See note 83, supra
 
 
 [85]
 See cases summarized in Dexter v. Equitable Life Assurance Soc'y of the United States, 527 F.2d 233, 236 n.9 (2d Cir. 1975); 1 National Association of Insurance Commissioners, Monitoring Competition: A Means of Regulating the Property and Liability Insurance Business 231-45 (1974); Weller, The McCarran-Ferguson Act's Antitrust Exemption for Insurance: Language, History and Policy, 1978 Duke L.J. 587, 606-14. One court, for example, found a McCarran-Ferguson exemption to be warranted upon a showing that the state had enacted a "comprehensive set of regulations" for the business of "title insurance." Commander Leasing Co. v. Transamerica Title Ins. Co., 477 F.2d 77, 83 (10th Cir. 1973). See also Ohio AFL-CIO v. Insurance Rating Bd., 451 F.2d 1178, 1182-83 (6th Cir. 1971). Other courts have focused on whether the state regulated the specific conduct alleged to be in violation of the federal antitrust laws. See Lawyers Title Co. of Mo. v. St. Paul Title Ins. Corp., 526 F.2d 795, 797 (8th Cir. 1975); Crawford v. American Title Ins. Co., 518 F.2d 217, 219 (5th Cir. 1975)
 
 
 [86]
 The New York Insurance Law provides:
 No person shall serve as a director of two or more insurers under this chapter which are or during the next preceding two years have been engaged in writing directly the same lines of commerce in insurance unless such interlocking directorate is not used as a means to substantially lessen competition generally in the business of insurance or create a monopoly therein. Notwithstanding the foregoing limitations any person otherwise qualified may be a director of two or more insurers having a common ownership or management if such common ownership or management is not otherwise proscribed and such interlocking directorate is not used as a means of substantially lessening competition generally in the business of insurance or of creating a monopoly therein.
 N.Y.Ins.Law § 67(2) (McKinney) (Supp.1980).
 
 
 [87]
 The New Jersey Insurance Code provides:
 No person shall be a director of 2 or more competing insurers so as to substantially lessen competition generally in the business of insurance or annuity or to create a monopoly therein.
 N.J.Stat.Ann. § 17B:30-11 (West) (Supp.1980).
 
 
 [88]
 Appellees' reliance on Addrisi v. Equitable Life Assurance Soc'y of the United States, 503 F.2d 725 (9th Cir. 1974), is misplaced. In Addrisi this court concluded that State law preempted application of federal antitrust laws to an alleged tying arrangement because state law regulated the same behavior. Id. at 728. See Greenberg v. Equitable Life Assurance Soc'y of the United States, 34 Cal.App.3d 994, 110 Cal.Rptr. 470 (1973). In contrast, neither New York nor New Jersey statutes regulate interlocks between banks and insurance companies. They merely prohibit certain types of interlocks and remain silent as to the rest. There is no evidence that either state has made a policy choice affirmatively to allow interlocks not specifically prohibited under the statutes. Neither state has a general statute regulating corporate interlocks, although New York has a number of statutes which like N.Y.Ins.Law § 67(2), regulate interlocks in particular industries. See N.Y.Transp.Law § 119(3) (McKinney) (1975) (rail and water carriers); N.Y.Alco.Bev.Cont.Law §§ 105(16), 106(13) (McKinney) (1970) (liquor retailers); N.Y.Banking Law § 130(3) (McKinney) (Supp.1980) (banks); id. 143(3) (bank holding companies); id. § 209(1) & (2) (foreign banks; national banks); id. § 247(5) (savings banks); id. § 399(5) (savings and loans); id. § 399-a (federal savings and loans)
 
 
 [89]
 Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Ware, 414 U.S. 117, 126-27, 94 S.Ct. 383, 389, 38 L.Ed.2d 348 (1973); Weller, To Preempt or to Accommodate: The Question of State and Federal Antitrust Laws Under the McCarran-Ferguson Act, 9 Tol.L.Rev. 421, 426 (1978)
 The legislative history of the McCarran-Ferguson Act indicates that Congress intended this principle to apply under the Act. Legislation to exempt the insurance industry completely from the antitrust laws passed the House, but died in the Senate. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. at 218-19, 99 S.Ct. at 1076-77. The legislation that became the McCarran-Ferguson Act was introduced a year later. It rejected total exemption and instead required only that the antitrust laws not be construed to "invalidate, impair, or supersede" any state law enacted for the purpose of regulating the business of insurance. 91 Cong.Rec. 478 (1945); cf. 15 U.S.C. § 1012(b) (1976). To the extent that a state regulatory scheme would not be "impaired," the federal antitrust laws were to apply. Several Senators thought even this limited exemption too broad, questioning the advisability of permitting states to preempt the antitrust laws. See, e. g., 91 Cong.Rec. 481 (1945) (remarks of Sen. Murdock); id. at 483 (remarks of Sen. O'Mahoney). The Senate adopted an amendment proposed by Senator Ferguson excluding the Sherman and Clayton Acts from this section of the Act. As amended, this section provided that "No Act of Congress, except ... the Sherman Act, and/or ... the Clayton Act, shall be construed to invalidate, impair, or supersede" state law. Id. at 488 (emphasis added). The House rejected the Ferguson Amendment, however, and passed the bill with the original language intact. Id. at 1085, 1093-94. The antitrust proviso was added in Conference as a compromise. As such, it was understood in the Senate, the only house to debate it, as an improvement on the House version of the Act. See id. at 1480-81, 1484 (remarks of Sen. Murdock); id. at 1478, 1485 (remarks of Sen. McCarran); id. at 1488 (remarks of Sen. Barkley). At a minimum, therefore, the federal antitrust laws apply to the extent they do not "invalidate, impair, or supersede" state law. See Weller, supra note 85, 1978 Duke L.J. 587, 602-07. Senator White stated that "the force and effect of these Federal statutes may be applicable and shall be applicable to whatever extent the State law fails to occupy the ground and engage in regulation(.)" 91 Cong.Rec. 1444 (1945). He asserted and Senator McCarran, one of the Senate Conferees, agreed that the antitrust laws would apply "throughout the whole field beyond the scope of the State's activity." Id.
 
 
 [90]
 The statute refers only to the "business of insurance," thus excluding on its face those activities of insurance companies that are not part of such business. Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. at 211, 99 S.Ct. at 1073; SEC v. National Securities, Inc., 393 U.S. at 453, 459-60, 89 S.Ct. at 564, 568, 21 L.Ed.2d 668. The Committee reports read solely in these terms. See H.R.Rep.No.213, 79th Cong., 1st Sess. (1945); H.R.Rep.No.143, 79th Cong., 1st Sess., reprinted in (1945) U.S.Code Cong. & Ad.News 670; S.Rep.No.20, 79th Cong., 1st Sess. (1945). There is no suggestion in the legislative debates that Congress intended to protect parties or activities outside this industry; some activities technically part of the "insurance industry" may not be exempt. See Group Life & Health Ins. Co. v. Royal Drug Co., 440 U.S. at 232 n.39, 99 S.Ct. at 1083 n.39. The bills drafted by the National Association of Insurance Commissioners and adopted in some states in response to the McCarran-Ferguson Act dealt only with intra-industry problems. See 1946 Proceedings of the N. A. I. C. 397-421. The "little Clayton Acts" adopted in many states, including New York and New Jersey, are similarly limited to intra-industry interlocks. See, e.g., notes 86 & 87, supra. That Congress should limit the exemption to the insurance industry is not surprising:
 (T)here is a real danger that state insurance departments not only lack the authority and expertise to regulate other businesses, but that they are also apt to favor their industry at the expense of others. Trade restraints affecting other businesses, for example, might be viewed favorably if they add to the stability and financial security of insurance companies. Nor did Congress at any time intimate that the special needs of insurance transcended the insurance business and must include the ability to restrain trade in other sectors of the economy.
 Weller, supra note 85, 1978 Duke L.J. 587, 632.
 
 
 [91]
 There is language in Group Life from which one might infer that a state statute regulating the composition of boards of directors of insurance companies would not relate to the "business of insurance." 440 U.S. at 230 n.38, 99 S.Ct. at 1082 n.38
 Appellees point to statements in the Senate debate regarding Section 3(a), the moratorium provision (supra note 83), to the effect that the interlocking directorate provision of the Clayton Act would be stayed during the moratorium period to make it possible "to change the interlocking directorate laws of the states." 91 Cong.Rec. 484 (1945) (remarks of Sen. Ferguson); id. at 483 (remarks of Sen. O'Mahoney). It does not follow from these comments that Congress intended to include interlocking directorates in the "business of insurance" which states by regulating could exempt from the antitrust acts. The moratorium had several purposes, only one of which was to give states time to regulate activities which otherwise would be regulated by the federal antitrust laws. The moratorium was also intended to afford the states time in which to change those laws that might conflict with federal law in the areas where federal law would still be paramount, and to afford insurance companies time to adjust their activities to conform with federal regulation. See id. at 481, 486 (remarks of Sen. Murdock); id. at 483, 488 (remarks of Sen. O'Mahoney); id. at 1086 (remarks of Rep. Walter). Indeed it was concern for the latter two problems that provided the sole basis for including a moratorium provision in the Senate's version of the Act, which provided that the Clayton Act would apply to the business of insurance at the end of the moratorium period notwithstanding any inconsistent state regulation. See note 89, supra.
 
 
 [92]
 Cf. SEC v. National Securities, Inc., supra, 393 U.S. at 460, 89 S.Ct. at 568 (regulation of the relationship between a company and its shareholders is securities regulation, not insurance regulation)
 Appellees argue that if any aspect of a unitary activity regulated by the state in this case, the selection of a corporate board of directors is the business of insurance, the entire activity is the business of insurance and thus exempt. This view was rejected in National Securities, where the Supreme Court held that state regulation of aspects of insurance company mergers that effect policyholders is regulation of the business of insurance, though concurrent state regulation of aspects of mergers affecting stockholders is not. Id.